Vincent A. Lupiano, J.
On October 27,1969 the Coordinator of Discipline at a city high school received information which caused him to proceed to a certain classroom. He sought out the defendant, a student, in the room and requested that he accompany him to his office. This the defendant did willingly. Bn route, the Coordinator observed a bulge in the defendant’s left pants pocket and further observed him continually putting his hand in and taking it out of the pocket. As they neared *910 his office, the defendant bolted for the door at the outside of the school. As he did this, the Coordinator noticed a policeman standing in front of his office and called out to him, “ He’s got junk and he’s escaping ’ ’. With that he pursued the defendant and caught up with him three blocks from the school. The Coordinator grabbed the defendant, who still had his left hand in his left side pants pocket. Grabbing defendant’s wrist, the latter’s hand came out revealing the nipple of an eyedropper with other material clenched in his fist. The Coordinator held defendant’s wrist and said, “ Give that to me”; thereupon the Coordinator opened his hand and found a set of “ works ”, syringe, eyedropper, etc. This material, the subject matter of the motion to suppress, was then turned over to the police officer who also had pursued the boy and came upon the scene at that moment. The court below suppressed the evidence on the ground that the Coordinator, a governmental official, had searched the defendant without the prerequisite of probable cause, in violation of his constitutional rights.
Here, the Coordinator of Discipline of a city high school, acting with a high degree of suspicion, but short of probable cause, searched this student and found him in possession of a set of narcotics ‘ ‘ works ’ ’. While a student has the right to be free of unreasonable search and seizure, school authorities, in view of the “ distinct relationship ” between them and their students and the right of parents to expect that certain safeguards will be taken, have 1 ‘ the affirmative obligation * * *
to investigate any charge that a student is using or possessing narcotics ”, which ‘ ‘ becomes a duty when suspicion arises ” (People v. Overton, 20 N Y 2d 360, 362-363; see, also, Moore v. Student Affairs Committee, 284 F. Supp. 725, 729-730). A school official, standing in loco parentis to the children entrusted to his care, has, inter alia, the long-honored obligation to protect them while in his charge, so far as possible, from harmful and dangerous influences, which certainly encompasses the bringing to school by one of them of narcotics and “ works ”, whether for sale to other students or for administering such to himself or other students. I have read the citation of authorities given in the dissenting opinion relating to the “ philosophy of loco parentis ”. Those cases áre not affected by the doctrine and are inapposite.
What the Constitution (Fourth Amendment) forbids is not all searches and seizures, but unreasonable searches and seizures (Elkins v. United States, 364 U. S. 206, 222). Each search must be determined in its own setting. The amendment, *911 as it relates to seized property, after search, does not apply to private persons. Classifying the Coordinator as a governmental official, in his capacity and sphere of responsibility embracing the purpose and duties he is called upon to perform with respect to his charges, it would not be unreasonable or unwarranted that he be permitted to search the person of a student where the school official has reasonable suspicion that narcotics may be found on the person of his juvenile charge. Such action, of an investigatory nature, would and should be expected of him. Being justified, he would still be performing this important function, though three blocks from school, necessitated by the flight of this errant boy. As I view the incident, the Coordinator’s function and responsibility went with him during the chase that took him and the boy away from the school. In loco parentis purpose did not end abruptly at the school door. The need to fulfill that purpose — including the making of a search — extended uninterruptedly beyond the school limits since the defendant chose to run away. This is a far cry from a situation not stemming from the school, without the nexus existing here. Absent that nexus, the search and seizure by the Coordinator would be unreasonable and unlawful for the obvious reason that his duties and responsibilities originate within the school.
To circumscribe the official’s action, in these circumstances, within school limits would be akin to the incident where the cinematic county sheriff stops in hot pursuit of the wrongdoer at the" county line, ruefully watching him cross over, powerless to do anything more.
The dissenting opinion emphasizes that the search and seizure happened away from the school and that the action of the policeman and the school official conjoined in making the search and seizure. This is misplaced emphasis, because proper place is not given to the official’s right and duty to act as he did in the circumstances, originally and independently,, in fulfillment of a quasi-parental obligation. Moreover, this right and duty did not make him a law enforcement officer as the dissent suggests. Rather as the doctrine suggests, and simply stated, he was acting in a limited manner, in place of the defendant’s parents. In the landmark case, relating to the duty of teachers in the supervision of school children, the Court of Appeals in Hoose v. Drumm (281 N. Y. 54, 57-58) stated: 11 At recess periods, not less than in the class room, a teacher owes it to his charges to exercise such care of them as a parent of *912 ordinary prudence would observe in comparable circumstances.” (Italics supplied.)
Stated differently, a school teacher, to a limited extent at least, stands in loco parentis to pupils under his charge, and may exercise such powers of control, restraint and correction over them as may he reasonably necessary to enable him properly to perform his duties as a teacher and accomplish the purposes of education (79 C. J. S., School and School Districts, § 493).
This doctrine is imbedded in the common law and has received implicit recognition by our State Legislature through the enactment of section 35.10 of the Penal Law, which restates the former Penal Law, section 246 (subds. 4, 6). The section declares: ‘ ‘ The use of physical force upon another person which would otherwise constitute an offense is justifiable and not criminal under any of the following circumstances:
“1. A parent, guardian or other person entrusted with the care and supervision of a minor or an incompetent person, and a teacher or other person entrusted with the care and supervision of a minor for a special purpose, may use physical force, but not deadly physical force, upon such minor or incompetent person when and to the extent that he reasonably believes it necessary to maintain discipline or to promote the welfare of such minor or incompetent person.” (Italics supplied.)
Without proper recognition of the doctrine, the reasonableness of the official’s conduct toward the defendant cannot be properly viewed and concluded. With full recognition, however, the action of the official toward the student, taken in school and away from school, partaking of their ‘ distinct relationship ”, may be better understood and accepted as necessary and reasonable in light of loco parentis and in juxtaposition with the Fourth Amendment (see, generally, Terry v. Ohio, 392 U. S. 1).
As was expressed in People v. Overton (24 N Y 2d 522, 526) the school official, there, was performing the ‘ ‘ fulfillment of the trust and responsibility given him by the city residents ” in relation to a high school student. On remand from the Supreme Court (393 U. S. 85), the Court of Appeals held, in effect, that the inspection of the locker, under attack, was not the result of “ legal coercion ” but was permissible conduct in conformity with the in loco parentis doctrine, conditioned only by reasonable suspicion. As I view the present incident, the school official was fulfilling a comparable “ trust and responsi *913 bility ” and similar approval of his conduct should be accorded without imposition of probable cause.
Also, appropriate analogy may be made from section 180-a of the Code of Criminal Procedure, known as the “ Stop and Frisk ” law which permits a police officer to stop any person in a public place for temporary questioning when he reasonably suspects such person is committing or is about to commit a felony, and to frisk the suspect for weapons if he reasonably suspects that his life is in danger. This law is not cited for comparison of any factual pattern suggested by that law. The section points up, however, that one of the absolutes under the Fourth Amendment, namely, probable cause, is displaced by reasonable suspicion for the reason that a frisk, sometimes likened to a lesser invasion of a search, is necessary as an incident to inquiry upon grounds of elemental safety and precaution which might not initially sustain a search (see People v. Taggart, 20 N Y 2d 335; see, also, People v. Peters, 18 N Y 2d 238; People v. Sibron, 18 N Y 2d 603).
As stated in People v. Peters (supra, p. 247) “ The Fourth Amendment protects not against all searches and seizures, but ‘ against unreasonable searches and seizures \ The doctrine of 1 stop and frisk upon reasonable suspicion ’ does not produce unreasonable searches and seizures ”.
The m loco parentis doctrine is so compelling in light of public necessity and as a social concept antedating the Fourth Amendment, that any action, including a search, taken thereunder upon reasonable suspicion should be accepted as necessary and reasonable. Seemingly, like rationale founded on extreme public purpose was used in Sibron, Peters and Taggart, supra, dispensing with probable cause as a requirement in the circumstances of those cases.
In Camara v. Municipal Court (387 U. S. 523, 528) the Supreme Court, discussing the Fourth Amendment declared: ‘ ‘ The basic purpose of this Amendment * * * is to safeguard the privacy and security of individuals against arbitrary invasions by government officials ” (italics supplied).
As noted, the rigid standard, probable cause, may not be imposed upon a.school official if he is expected to act effectively vrtf loco parentis. While we are far advanced from the days of the little red schoolhouse, such advancement has also brought great ills. Rampant crime and drug abuse threaten our schools and the youngsters exposed to such ills. Much could be written about the ponderous problems that beset parents and school authorities in their efforts to prevent and stave off the condi *914 tions all about us. We are well aware of the gravity of these conditions. There is no need for enlargement. In consequence, greater responsibility has fallen upon those charged with the well-being and discipline of these children. What they may do in that regard should be weighed, on balance, with full appreciation of their duties and the nature of that greater responsibility. Only then can reasonableness be concluded in the context of the prevailing circumstances relating to the Fourth Amendment. Of course, absolute control should not be handed over in the everyday dealings with these children. Reasonable restraint is imposed, less what the school officials do shall take the form of authoritarian behavior, trammelling the rights of the students entrusted to them. Toward that end, a basis founded at least upon reasonable grounds for suspecting that something unlawful is being committed, or about to be committed, shall prevail before justifying a search of a student when the school official is acting m loco parentis.
I, therefore, conclude that within the framework of this happening, no arbitrary invasion of the defendant’s privacy resulted. On the contrary, the search and seizure, based at least upon reasonable grounds for suspecting that something unlawful was being committed, or about to be committed, must be deemed a reasonable search and seizure within the intendment of the Fourth Amendment as applied to the “ distinct relationship ” of the high school official to his student.
The order should be reversed on the law and the facts. Motion to suppress hypodermic needle and “works” denied and the case remitted to the court below for further appropriate proceedings.