STATE IN THE INTEREST OF T.L.O., JUVENILE-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JEFFREY ENGERUD, DEFENDANT-APPELLANT.

Argued May 10, 1983—Decided August 8, 1983.

334

*Lois DeJulio,* First Assistant Deputy Public Defender, argued the cause for appellant T.L.O. (*Joseph H. Rodriguez,* Public Defender, attorney).

*Randolph A. Newman,* Designated Counsel, argued the cause for appellant Jeffrey Engerud (*Joseph H. Rodriguez,* Public Defender, attorney).

*Victoria Curtis Bramson,* Deputy Attorney General, argued the cause for respondent State of New Jersey (*State in the Interest of T.L.O.*) (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Victoria Curtis Bramson* and *Mark Paul Cronin,* Deputy Attorneys General, of counsel and on the brief).

*Rocky L. Peterson,* Deputy Attorney General, argued the cause for respondent (*State v. Engerud*) (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney).

*Paula A. Mullaly,* General Counsel, submitted a brief on behalf of *amicus curiae* New Jersey School Boards Association (*State in the Interest of T.L.O.*) (*Paula A. Mullaly,* attorney; *Anthony P. Sciarrillo,* on the brief).

*Barry S. Goodman* submitted a brief on behalf of *amicus curiae* American Civil Liberties Union of New Jersey (*State in*

*the Interest of T.L.O.*) (*Crummy, Del Deo, Dolan & Purcell* attorneys).

The opinion of the Court was delivered by

O'HERN, J.

The issues here are (1) whether the Fourth Amendment exclusionary rule applies to student searches made by public school administrators; and (2) what standard determines the reasonableness of the search if the exclusionary rule does apply.

## T.L.O.

On March 7, 1980, a teacher at Piscataway High School reported that fourteen year old T.L.O. and another student were smoking in the girls' restroom. School regulations forbade smoking in that area and the teacher took the students to the assistant principal's office. He asked the students whether they had been smoking. T.L.O.'s companion admitted smoking and the assistant principal assigned her to a three-day smoking clinic.

T.L.O. denied smoking in the lavatory or indeed smoking at all. The assistant principal asked T.L.O. to go with him into a private office. He closed the door and asked her to turn over her purse. At this time they were both seated at a desk, he behind and she in front. When he opened the purse on the desk, he saw a pack of Marlboros. He picked up the cigarettes and said "You lied to me." As he reached into the purse for the cigarettes, he saw rolling papers in plain view. That fact, his experience told him, meant that marijuana was probably involved. He therefore looked further into the purse and found a metal pipe of the kind used for smoking marijuana, empty plastic bags and one plastic bag containing a tobacco-like substance. His search also revealed an index card reading "People who owe me money," followed by a list of names and amounts of $1.50 and $1.00, and two letters, one from T.L.O. to another student and a return letter, both containing language clearly

indicating drug dealing by T.L.O. The purse also contained $40, most of it in one-dollar bills.

The assistant principal called T.L.O.'s mother and the police. A police officer asked the mother to bring T.L.O. to police headquarters for questioning. There, T.L.O. admitted selling marijuana to other students. She was charged with delinquency based on possession of marijuana with the intent to distribute. *N.J.S.A.* 2A:4–44; 24:21–20(a)(4); 24:21–19(a)(1).[1]

T.L.O. moved to suppress the evidence seized from her purse and her confession, claiming that the search tainted the confession. She also argued that she had not knowingly waived her right to remain silent. The Juvenile and Domestic Relations Court denied the motion to suppress. 178 *N.J.Super.* 329 (1980).[2] It found the Fourth Amendment exclusionary rule applicable to school searches, but found the standard applicable to such a search to be "a reasonable suspicion that a crime has been or is in the process of being committed, *or* reasonable cause to believe that the search is necessary to maintain school discipline or enforce school policies." 178 *N.J.Super.* at 341 (emphasis in original). It concluded that the assistant principal had justification for opening the purse, since he had reasonable cause to believe that smoking, a violation of school policy, had occurred. Once he had opened the purse, in the court's opinion, the contents were subject to the "plain view" doctrine. Having

---

[1]Since this drug offense occurred on school property, the school, in accordance with published procedures, administratively suspended the juvenile for ten days.

[2]During the pendency of the delinquency proceeding, the juvenile, by her parents, challenged her suspension in Superior Court, Chancery Division. That court ordered the suspension quashed because the search that revealed the marijuana violated the Fourth and Fourteenth Amendments.

The Juvenile Court considered and denied the juvenile's motion to dismiss the delinquency complaint. It refused to give *res judicata* or collateral estoppel effect to the Chancery Division's suppression of evidence in appellant's challenge to her suspension. 178 *N.J.Super.* at 343–45. That issue is not before us.

found the marijuana and paraphernalia, the assistant principal justifiably continued his search to determine the extent of that violation. 178 *N.J.Super.* at 343.

On appeal, the Appellate Division affirmed the denial of the suppression motion on the basis of the Juvenile Court's opinion. 185 *N.J.Super.* 279 (1982). But it vacated the adjudication of delinquency and remanded for further proceedings to determine whether the juvenile had knowingly waived her constitutional rights before giving the confession. Judge Joelson dissented from that portion of the opinion that approved a standard lower than probable cause for school searches. He characterized this as "riding rough-shod over the rights of a juvenile in school." 185 *N.J.Super.* at 284 (Joelson, J., dissenting). T.L.O. appealed to us of right on the basis of the dissent below. *R.* 2:2–1(a)(2).

## ENGERUD

On January 29, 1980, a vice-principal at Somerville High School met with a Somerville police detective in the high school office. The detective had just received a telephone call from a person claiming to be the father of a student. The caller said that the defendant, an eighteen year old student at the school, was selling drugs in the school and if the police did not stop it, he would take matters into his own hands. Their conversation lasted five minutes and the detective left the building.

The vice-principal then relayed this information to the assistant principal and the principal. The principal had heard a "rumor" a year earlier that the defendant was selling drugs at the school. He and the assistant principal opened the defendant's locker through the use of a pass-key that could open any locker in the building even though the lockers are equipped with combination locks. The two men made a complete search of the locker and its contents. In the defendant's coat pocket they found two plastic bags containing packets of a white substance that turned out to be methamphetamine (speed). Each packet

was marked with its weight in fractions of a gram. They also discovered a package of marijuana rolling paper.

The vice-principal called the police and defendant's parents and took the defendant out of class. The principal asked the defendant to empty his pockets. This disclosed a small quantity of marijuana and $45 in cash.

Engerud was charged with unlawful possession of a controlled dangerous substance and unlawful possession of a controlled dangerous substance with intent to distribute. *N.J.S.A.* 24:21–20(a)(1); 24:21–19(a)(1). On June 18, 1981, the Law Division judge denied a motion to suppress the evidence obtained from the locker and pocket searches. In his view the search was "responsible and diligent under all of the circumstances."

On July 9, 1981, defendant pleaded guilty to the second count of the indictment and was sentenced to an indeterminate term at Yardville, not to exceed five years. His sentence was stayed pending appeal. We certified Engerud's appeal directly. *R.* 2:12–1. 93 *N.J.* 308 (1983).

## I.

"It can hardly be argued that ... students ... shed their constitutional rights ... at the schoolhouse gate." *Tinker v. Des Moines Ind. Community School Dist.,* 393 *U.S.* 503, 506, 89 *S.Ct.* 733, 736, 21 *L.Ed.*2d 731, 737 (1969). In *Tinker,* the Supreme Court recognized that wearing an armband in school for the purpose of expressing certain views is a type of symbolic act that is protected by the free speech clause of the First Amendment. *Id.* at 505, 89 *S.Ct.* at 735, 21 *L.Ed.*2d at 737. It found that wearing the armband in the circumstances of the case involved no actually or potentially disruptive conduct, *id.,* and that students' constitutional rights are protected unless their conduct "materially disrupts classwork or involves substantial disorder or invasion of the rights of others," *id.* at 513, 89 *S.Ct.* at 740, 21 *L.Ed.*2d at 741. *Goss v. Lopez,* 419 *U.S.* 565, 95 *S.Ct.* 729, 42 *L.Ed.*2d 725 (1975), establishes that whenever

students face loss of an important substantive right, they share with every person protected by the Constitution the right to procedural due process.

This long-standing[3] recognition of students' legitimate entitlement to the minimum protections of the Constitution parallels the developing concern of the Court that the juvenile justice system reflect the fundamental fairness that our Constitution guarantees adult offenders. *See In re Gault,* 387 *U.S.* 1, 87 *S.Ct.* 1428, 18 *L.Ed.*2d 527 (1967). Young people and students are persons protected by the United States and New Jersey Constitutions. *E.g., Island Trees Union Free School Dist. No. 26 Bd. of Educ. v. Pico,* 457 *U.S.* 853, ——, 102 *S.Ct.* 2799, 2807, 73 *L.Ed.*2d 435, 445–46 (1982); *Tinker,* 393 *U.S.* at 511, 89 *S.Ct.* at 739, 21 *L.Ed.*2d at 740; *Gault,* 387 *U.S.* at 13, 87 *S.Ct.* at 1436, 18 *L.Ed.*2d at 538. *But compare Ingraham v. Wright,* 430 *U.S.* 651, 97 *S.Ct.* 1401, 51 *L.Ed.*2d 711 (1977) (Eighth Amendment does not bar moderate corporal punishment of students) *with N.J. S.A.* 18A:6–1 (banning corporal punishment in New Jersey schools).

Some contend, however, that the exclusionary rule should not apply since the fundamental purpose of *Mapp v. Ohio,* 367 *U.S.* 643, 81 *S.Ct.* 1684, 6 *L.Ed.*2d 1081 (1961), is to deter law enforcement officials from violating constitutional rights. They suggest that the school official be viewed as a private person, indeed as one *in loco parentis,*[4] whose relationship to the student

---

[3]In *Tinker,* Justice Fortas showed that the Court had for half a century unmistakably recognized the application of constitutional rights to students. 393 *U.S.* at 506, 89 *S.Ct.* at 736, 21 *L.Ed.*2d at 737 (citing, *inter alia, West Virginia Bd. of Educ. v. Barnette,* 319 *U.S.* 624, 63 *S.Ct.* 1178, 87 *L.Ed.* 1628 (1943); *Pierce v. Society of Sisters,* 268 *U.S.* 510, 45 *S.Ct.* 571, 69 *L.Ed.* 1070 (1925); *Bartels v. Iowa,* 262 *U.S.* 404, 43 *S.Ct.* 628, 67 *L.Ed.* 1047 (1923); *Meyer v. Nebraska,* 262 *U.S.* 390, 43 *S.Ct.* 625, 67 *L.Ed.* 1042 (1923)).

[4]Judges and commentators have not failed to detect the irony of this analogy. They suggest that parents infrequently search their children and turn the evidence over to police for prosecution. *E.g., State in Interest of T.L.O.,* 185 *N.J.Super.* 279, 282 (App.Div.1982) (Joelson, J., dissenting); *Mer-*

does not invoke the same protections as a search by a law enforcement official. But "[t]he Fourteenth Amendment [here incorporating the Fourth Amendment], as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted." *West Virginia Bd. of Educ. v. Barnette,* 319 *U.S.* 624, 637, 63 *S.Ct.* 1178, 1185, 87 *L.Ed.* 1628, 1637 (1943) (school may not compel flag salute over religious objection); *State in Interest of G.C.,* 121 *N.J.Super.* 108, 114 (J.D.R.C.1972). The "basic purpose of [the Fourth Amendment] is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *In re Martin,* 90 *N.J.* 295, 312 (1982) (Pashman, J.) (quoting *Marshall v. Barlow's, Inc.,* 436 *U.S.* 307, 312, 98 *S.Ct.* 1816, 1820, 56 *L.Ed.2d* 305, 311 (1978); *Camara v. Municipal Court,* 387 *U.S.* 523, 528, 87 *S.Ct.* 1727, 1730, 18 *L.Ed.2d* 930, 935 (1967)).

It is of little comfort to one charged in a law enforcement proceeding whether the public official who illegally obtained the evidence was a municipal inspector, *See v. Seattle,* 387 *U.S.* 541, 87 *S.Ct.* 1737, 18 *L.Ed.2d* 943 (1967); *Camara,* 387 *U.S.* 523, 87 *S.Ct.* 1727, 18 *L.Ed.2d* 930; a firefighter, *Michigan v. Tyler,* 436 *U.S.* 499, 506, 98 S.Ct. 1942, 1948, 56 *L.Ed.2d* 486, 496 (1978); or school administrator or law enforcement official. We believe that the issue is settled by the decisions of the Supreme Court and we accept the proposition that if an official search violates

cer *v. State,* 450 *S.W.2d* 715, 721 (Tex.Civ.App.1970) (Hughes, J., dissenting); *State v. McKinnon,* 88 *Wash.2d* 75, 91, 558 *P.2d* 781, 790 (Wash.Sup.Ct.1977) (Rosellini, J., dissenting); Buss, "The Fourth Amendment and Searches of Students in Public Schools," 59 *Iowa L.Rev.* 739, 768 (1974); Trosch, Williams & DeVore, "Public School Searches and the Fourth Amendment," 5 *J.L. & Educ.* 41, 53 (1982); Comment, 5 *Fla.St.U.L.Rev.* 526, 531 (1977). Today, cases reject broad application of the concept. *E.g., Horton v. Goose Creek Ind. School Dist.,* 690 *F.2d* 470, 480 n. 18 (5th Cir.1982), *cert. den.,* —— *U.S.* ——, 103 *S.Ct.* 3536, 77 *L.Ed.2d* 1387 (1983); *D.R.C. v. State,* 646 *P.2d* 252, 255 (Alaska Ct.App.1982).

constitutional rights, the evidence is not admissible in criminal proceedings.[5]

## II.

A more difficult question is whether a school official may effect a search without a warrant. We start with this proposition:

> The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." [*Mincey v. Arizona,* 437 *U.S.* 385, 390, 98 *S.Ct.* 2408, 2412, 57 *L.Ed.*2d 290, 298–99 (1978) (quoting *Katz v. United States,* 389 *U.S.* 347, 357, 88 *S.Ct.* 507, 514, 19 *L.Ed.*2d 576, 585 (1967))].

*See also State v. Bruzzese,* 94 *N.J.* 210, 217–18 (1983); *State v. Patino,* 83 *N.J.* 1, 7 (1980).

Our Court has generally held that, except in certain carefully defined classes of cases, officials may not conduct administrative searches of private property without a warrant. *Martin,* 90 *N.J.* 295. One of the best recognized exceptions is for "pervasively regulated" businesses. *United States v. Biswell,* 406 *U.S.* 311, 315–16, 92 *S.Ct.* 1593, 1596, 32 *L.Ed.*2d 87, 92 (1972); *Martin,* 90 *N.J.* at 312; *State v. Dolce,* 178 *N.J.Super.* 275, 283 (App.Div. 1981). Although the school setting does not at first glance fit that general mode, "[w]ithin that matrix, we examine the statute[s] and conduct of the [school officials] in this case." *See State v. Williams,* 84 *N.J.* 217, 225 (1980).

The Legislature has specifically charged school officials to maintain order, safety and discipline. The statutes give them

---

[5]Our Code of Juvenile Justice buttresses this conclusion. It specifically provides:

> The right to be secure from unreasonable searches and seizures ... shall be applicable in cases arising under this act as in cases of persons charged with crime. [*N.J.S.A.* 2A:4–60].

Juvenile proceedings are not criminal proceedings but for ease of discussion we shall refer to suppression of evidence in criminal proceedings when a juvenile is charged with an offense under *N.J.S.A.* 2A:4–44 that would be a criminal offense if committed by an adult.

authority to prevent disorderly conduct by pupils, *N.J.S.A.* 18A:25–2, and students are required to submit to such authority, *N.J.S.A.* 18A:37–1. Specifically, school officials have power to suspend pupils for illegal possession or consumption of drugs or alcohol, *N.J.S.A.* 18A:37–2(j), for assaulting teachers, *N.J.S.A.* 18A:37–2.1, or for other good cause. *See N.J.S.A.* 18A:37–2, –4. Other statutes allow them to deal specifically with pupils who are under the influence of drugs or alcohol, *N.J.S.A.* 18A:40–4.1 (principal shall notify parent); *N.J.S.A.* 18A:35–4a (board of education shall establish policies and procedures for evaluating and treating alcohol users). Finally, *N.J.S.A.* 18A:6–1 grants specific power to seize weapons or other dangerous items and to quell disturbances. ·

 Taken together, these statutes yield the proposition that school officials, within the school setting, have the authority to conduct reasonable searches necessary to maintain safety, order and discipline within the schools. This holding comports with prevailing decisional law. Judge Frank Johnson has stated it thus in the context of a college dormitory search:

> A student naturally has the right to be free of unreasonable search and seizures, and a tax-supported [school] may not compel a "waiver" of that right as a condition precedent to admission. The [school], on the other hand, has an "affirmative obligation" to promulgate and to enforce reasonable regulations designed to protect campus order and discipline and to promote an environment consistent with the educational process. The validity of the regulation authorizing search of dormitories thus does not depend on whether a student "waives" his right to Fourth Amendment protection or on whether he has "contracted" it away; rather, its validity is determined by whether the regulation is a reasonable exercise of the [school's] supervisory duty. In other words, if the regulation —or, in the absence of a regulation, the action of the [school] authorities—is necessary in aid of the basic responsibility of the institution regarding discipline and the maintenance of an "educational atmosphere," then it will be presumed facially reasonable despite the fact that it may infringe to some extent on the outer bounds of the Fourth Amendment rights of students. [*Moore v. Student Affairs Comm. of Troy State University,* 284 *F.Supp.* 725, 729 (M.D.Ala.1968) (footnotes omitted)].

 We agree with that analysis and we too "reject as unsound the notion that . . . [students] waive their Fourth Amendment rights." *See Williams,* 84 *N.J.* at 225 (pervasively

regulated licensee does not "waive" constitutional rights). As in so many areas of the law, we must consider competing claims. Here we must weigh the individual student's rights against the school's obligation to maintain order. *Cf. State v. Williams*, 93 *N.J.* 39 (1983) (free press and fair trial rights); *In re Hinds*, 90 *N.J.* 604 (1982) (free speech and orderly trial). We are satisfied that the legislative scheme for public education in New Jersey contemplates a narrow band of administrative searches to achieve educational purposes.

### III.

■ Finally, we must articulate the standard that should guide the school official in the conduct of the search. We reiterate the proposition that "[t]he basic purpose of [the Fourth] Amendment, as recognized in countless decisions of [the Supreme] Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara*, 387 *U.S.* at 528, 87 *S.Ct.* at 1730, 18 *L.Ed.2d* at 935. Whenever warrantless searches are authorized by law, they "are themselves subject to the independent constitutional requirement of reasonableness." *In re Martin*, 90 *N.J.* at 314 n. 9 (citing *Barlow's*, 436 *U.S.* at 312, 98 *S.Ct.* at 1820, 56 *L.Ed.2d* at 311).[6]

Courts have adhered to the probable cause standard when police have participated in the search. *Picha v. Wielgos*, 410 *F.Supp.* 1214 (N.D.Ill.1976); *Piazzola v. Watkins*, 316 *F.Supp.*

---

[6]For example:

It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human decency. Apart from any constitutional readings and rulings, simple common sense would indicate that the conduct of the school officials in permitting such a nude search was not only unlawful but outrageous under "settled indisputable principles of law." [*Doe v. Renfrow*, 631 *F.2d* 91, 92–93 (7th Cir.1980), *cert.* den., 451 *U.S.* 1022, 101 *S.Ct.* 3015, 69 *L.Ed.2d* 395 (1981)].

624 (M.D.Ala.1970), aff'd, 442 *F.*2d 284 (5th Cir.1971); *M.J. v. State*, 399 *So.*2d 996 (Fla.Dist.Ct.App.1981); *People v. Bowers*, 72 *Misc.*2d 800, 339 *N.Y.S.*2d 783 (N.Y.Crim.Ct.1973); Annot., 49 *A.L.R.*3d 978, 987–89 (1973); *see also Waters v. United States*, 311 *A.*2d 835, 837–38 (D.C.Ct.App.1973). If it should occur that a police-initiated search employs school officials for law enforcement purposes, courts will have little difficulty in finding a subterfuge. *Piazzola*, 316 *F.Supp.* at 628.

But when police have not participated in the search, courts have generally phrased the standard in terms less stringent than probable cause. The Supreme Court of Washington has outlined the reasons for this view:

> The high school principal is not a law enforcement officer. His job does not concern the discovery and prevention of crime. His duty as the chief administrator of the high school includes a primary duty of maintaining order and discipline in the school. In carrying out this duty, he should not be held to the same probable cause standard as law enforcement officers. Although a student's right to be free from intrusion is not to be lightly disregarded, for us to hold school officials to the standard of probable cause required of law enforcement officials would create an unreasonable burden upon these school officials. Maintaining discipline in schools oftentimes requires immediate action and cannot await the procurement of a search warrant based on probable cause. We hold that the search of a student's person is reasonable and does not violate his Fourth Amendment rights, if the school official has reasonable grounds to believe the search is necessary in the aid of maintaining school discipline and order. [*State v. McKinnon*, 88 *Wash.*2d 75, 81, 558 *P.*2d 781, 784 (1977).].[7]

---

[7]This standard is closely akin to that articulated in the much-cited case of *People v. Jackson*, 65 *Misc.*2d 909, 319 *N.Y.S.*2d 731 (N.Y.App. Term 1971), aff'd, 30 *N.Y.*2d 734, 333 *N.Y.S.*2d 167, 284 *N.E.*2d 153 (N.Y.Ct.App.1972). That case sustained a student search in which the school official had "reasonable grounds for suspecting that something unlawful was being committed, or about to be committed." 65 *Misc.*2d at 914, 319 *N.Y.S.*2d at 736.

The majority of cases have adopted either the *Jackson* or *McKinnon* standard. *E.g., State v. Baccino*, 282 *A.*2d 869 (Del.Super.Ct.1971); *State v. D.T.W.*, 425 *So.*2d 1383 (Fla.Dist.Ct.App.1983); *People v. Ward*, 62 *Mich. App.* 46, 233 *N.W.*2d 180 (Mich.Ct.App.1975); *State in Interest of G.C.*, 121 *N.J.Super.* 108 (J.D.R.C.1972) ("reasonable suspicion"); *Tarter v. Raybuck*, 556 *F.Supp.* 625 (N.D.Ohio 1983) (dictum); *Stern v. New Haven Community Schools*, 529 *F.Supp.* 31 (E.D.Mich.1981); *Bilbrey v. Brown*, 481 *F.Supp.* 26 (D.Or.1979); *M. v. Ball-Chatham Community Unit School Dist. No. 5 Bd. of Educ.*, 429 *F.Supp.* 288 (S.D.Ill.1977) ("reasonable cause to believe").

██ We are satisfied that when a school official has reasonable grounds to believe that a student possesses evidence of illegal activity or activity that would interfere with school discipline and order, the school official has the right to conduct a reasonable search for such evidence.

██ In determining whether the school official has reasonable grounds, courts should consider "the child's age, history, and school record, the prevalence and seriousness of the problem in the school to which the search was directed, the exigency to make the search without delay, and the probative value and reliability of the information used as a justification for the search." *McKinnon,* 88 *Wash.*2d at 81, 558 *P.*2d at 784; *accord Bellnier v. Lund,* 438 *F.Supp.* 47, 53 (N.D.N.Y.1977); *State v. D.T.W.,* 425 *So.*2d 1383, 1387 (Fla.Dist.Ct.App.1983); *Doe v. State,* 88 *N.M.* 347, 352, 540 *P.*2d 827, 832 (N.M.Ct.App.1975); *People v. D.,* 34 *N.Y.*2d 483, 489, 358 *N.Y.S.*2d 403, 408, 315 *N.E.* 2d 466, 470 (N.Y.Ct.App.1974); *In Interest of L.L.,* 90 *Wis.*2d 585, 600, 280 *N.W.*2d 343, 351 (Wis.Ct.App.1979). *Cf. Tinker,* 393 *U.S.* at 513, 89 *S.Ct.* at 740, 21 *L.Ed.*2d at 741 (school limit on constitutional right justified when action "materially disrupts classwork or involves substantial disorder or invasion of the rights of others"). We also believe that "as the intrusiveness of the search intensifies, the standard of Fourth Amendment 'reasonableness' approaches probable cause." *M.M. v. Anker,* 607 *F.* 2d 588, 589 (2d Cir.1979).

The standard we adopt will not, as the dissent suggests, abandon the schools to drug pushers and muggers. We could make the same arguments that it does about preserving order in a city subway or on its streets. Surely, law enforcement would be easier without the Constitution, but that is not the way that the Framers chose.

We believe that our approach represents the best way to vindicate each student's right to be free from unreasonable searches and to receive a thorough and efficient education. Teachers' hands will not be tied. Indeed, commentators have

observed that teachers have a better vantage point than police for systematic observation of potentially criminal student activities and movements and thus can articulate the reasonable grounds for a search. Trosch, Williams & DeVore, "Public School Searches and the Fourth Amendment," 11 *J.L. & Educ.* 41, 55–56 (1982). In the long run, respect for law is the most cherished civic virtue that schools can impart. On that score, we agree with Justice Jackson:

> ... Boards of Education .... have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes. [*Barnette,* 319 *U.S.* at 637, 63 *S.Ct.* at 1185, 87 *L.Ed.* at 1637].

## IV.

Applying these principles to the cases, we conclude that both judgments must be reversed. In the case of T.L.O., the assistant principal did not have reasonable grounds to believe that the student was concealing in her purse evidence of criminal activity or evidence of activity that would seriously interfere with school discipline or order. A student has an expectation of privacy in the contents of her purse. Mere possession of cigarettes did not violate school rule or policy, since the school allowed smoking in designated areas. The contents of the handbag had no direct bearing on the infraction.

The assistant principal's desire, legal in itself, to gather evidence to impeach the student's credibility at a hearing on the disciplinary infraction does not validate the search. Moreover, there were not reasonable grounds to believe that the purse contained cigarettes, if they were the object of the search. No one had furnished information to that effect to the school official. He had, at best, a good hunch. No doubt good hunches would unearth much more evidence of crime on the persons of students and citizens as a whole. But more is required to sustain a search.

In addition, although not necessary to our decision, even conceding the reasonableness of the purse opening, we would be hard pressed to sustain the balance of the search. The sight of rolling papers might justify looking for drugs but not "whole-sale rummaging or browsing through a person's papers in the unparticularized hope of uncovering evidence of a crime." *State v. Smith,* 113 *N.J.Super.* 120, 135 (App.Div.1971).

■ In the case of Engerud, we also find lacking the neces-sary factual predicate for a reasonable ground to believe that his locker contained evidence in accordance with the test described. The official action was based only upon an "anonymous tip." The United States Supreme Court in revision of the *Aguilar v. Texas,* 378 *U.S.* 108, 84 *S.Ct.* 1509, 12 *L.Ed.2d* 723 (1964), three-pronged test of informant's reliability, has stressed that "[its] decisions applying the totality of circumstances analysis . . . have consistently recognized the value of corroboration of details of an informant's tip by independent police work." *Illi-nois v. Gates,* —— *U.S.* ——, ——, 103 *S.Ct.* 2317, 2334, 76 *L.Ed.* 2d 527 (1983). See *also Florida v. Royer,* —— *U.S.* ——, 103 *S.Ct.* 1319, 75 *L.Ed.2d* 229 (1983) (brief stop, but not search, of person fitting drug courier profile justified without more). In this case there was neither a reliable informer nor independent corroboration. See *People v. D.,* 34 *N.Y.2d* 483, 358 *N.Y.S.2d* 403, 315 *N.E.2d* 466 (vague information from "confidential sources" insufficient).

■ We are satisfied that in the context of this case the student had an expectation of privacy in the contents of his locker. "[T]he Fourth Amendment protects people, not places." *Katz,* 389 *U.S.* at 351, 88 *S.Ct.* at 511, 19 *L.Ed.2d* at 582. For the four years of high school, the school locker is a home away from home. In it the student stores the kind of personal "effects" protected by the Fourth Amendment. A student is justified in believing that the master key to the locker will be employed either at his request or convenience. That a master key exists to gain access to a hotel room does not make it any less entitled

to privacy. *See Stoner v. California,* 376 *U.S.* 483, 490, 84 *S.Ct.* 889, 893, 11 *L.Ed.*2d 856, 861 (1964); *United States v. Lyons,* 706 *F.*2d 321, 327–28 (D.C.Cir.1983). Had the school carried out a policy of regularly inspecting students' lockers, an expectation of privacy might not have arisen. *Cf. People v. Overton,* 20 *N.Y.*2d 360, 362, 283 *N.Y.S.*2d 22, 24, 229 *N.E.*2d 596, 598 (N.Y.Ct.App.1967), vacated, 393 *U.S.* 85, 89 *S.Ct.* 252, 21 *L.Ed.*2d 218 (1968), adhered to, 24 *N.Y.*2d 522, 301 *N.Y.S.*2d 479, 249 *N.E.* 2d 366 (N.Y.Ct.App.1969) (vice-principal had occasionally inspected lockers).

We do not disparage the school officials' actions in these cases. They must often, as here, act on short notice based on the information that they possess. Such officials have immunity from damages for claims resulting from their good faith judgments. *See Wood v. Strickland,* 420 *U.S.* 308, 95 *S.Ct.* 992, 43 *L.Ed.*2d 214 (1975). The issue here is not criticism of their actions but the adjudication of constitutional rights when students face juvenile or criminal charges.

## V.

In conclusion, (1) the obligation of school officials to furnish a thorough and efficient education and the statutory grants of power to school officials to maintain discipline confer the authority to conduct warrantless administrative searches on school premises;

(2) the Fourth Amendment protects students from unreasonable administrative searches and seizures;

(3) searches are reasonable in this context if school officials have reasonable grounds to believe that a student possesses evidence of illegal activity or activity that would interfere with school discipline and order, and the search itself is reasonable in scope;

(4) evidence otherwise obtained as a result of a warrantless search is illegally obtained and is inadmissible in criminal proceedings against students.

Having found that evidence was obtained in these cases in violation of these principles, we reverse the judgments below and direct that the evidence be suppressed.

SCHREIBER, J., dissenting.

Rather than tying the hands of school administrators in their formidable struggle to return our schools to places of learning and development, I would permit them to take reasonable steps to enforce valid school regulations. We must not lose sight of the fact that school administrators have an obligation to all children to ensure that they receive a quality education. In fulfilling this obligation to all students, school authorities frequently have a duty to invade an individual public school student's privacy to determine whether there have been infractions of, and to enforce, school regulations. Nonetheless, administrators do not have an unlimited right to make any intrusion they desire, for the students have a constitutional right "to be secure in their persons, houses, papers and effects against *unreasonable* searches and seizures . . . ." (emphasis supplied).

It is important to recognize what this case is *not*. The Court is not faced with police seeking to make a search or seizure that may lawfully be consummated only after a warrant has been obtained upon a showing of probable cause. Indeed, it should be noted that the police need not always satisfy the standard of probable cause. "When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause." *United States v. Place*, —— U.S. ——, ——, 103 *S.Ct.* 2637, 2642, 77 *L.Ed.*2d 110, 118 (1983). *See Illinois v. Lafayette*, —— U.S. ——, 103 *S.Ct.* 2605, 77 *L.Ed.*2d 65 (1983) (probable cause is irrelevant for inventory search made when arrested person is to be incarcerated); *United States v. Villamonte-Marquez*, —— U.S. ——, 103 *S.Ct.* 2573, 77 *L.Ed.*2d 22 (1983) (customs officials boarding vessel for routine inspection of documents held reasonable though no probable cause or suspicion); *Michigan v. Summers*, 452 *U.S.* 692, 101

*S.Ct.* 2587, 69 *L.Ed.*2d 340 (1981) (temporary detention of occupants while search of premises pursuant to a warrant is conducted is justifiable if based on articulable suspicion not amounting to probable cause); *South Dakota v. Opperman,* 428 *U.S.* 364, 96 *S.Ct.* 3092, 49 *L.Ed.*2d 1000 (1976) (when made in accordance with standard procedure, not unreasonable for police to make inventory search without probable cause of automobile impounded for parking violations); *United States v. Brignoni-Ponce,* 422 *U.S.* 873, 881, 95 *S.Ct.* 2574, 2580, 45 *L.Ed.*2d 607, 617 (1975) ("when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion"); *Terry v. Ohio,* 392 *U.S.* 1, 30, 88 *S.Ct.* 1868, 1884, 20 *L.Ed.*2d 889, 911 (1968) (stop and frisk permissible if police officer has an articulable suspicion "that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous . . . .").

The public school environment justifies a standard other than probable cause in deciding whether a public school administrator's investigations transgress reasonableness. Many jurisdictions have required that a search or seizure involving a public school student be predicated upon a "reasonable suspicion." *See, e.g., State in the Interest of G.C.,* 121 *N.J.Super.* 108, 117 (Cty.Ct.1972); *People v. Jackson,* 65 *Misc.*2d 909, 914, 319 *N.Y.S.* 2d 731, 736 (App.Term 1971), aff'd, 30 *N.Y.*2d 734, 284 *N.E.*2d 153, 333 *N.Y.S.*2d 167 (1972); *see also, e.g., Doe v. State,* 88 *N.M.* 347, 352, 540 *P.*2d 827, 832 (Ct.App.1975) (reasonable suspicion or reasonable cause to believe). This criterion has the advantage of having been applied by the Supreme Court. *See United States v. Brignoni-Ponce,* 422 *U.S.* at 882, 95 *S.Ct.* at 2580, 45 *L.Ed.*2d at 617. I do not know whether it functionally differs from the majority's "reasonable grounds to believe." To the extent that it requires more than a well-grounded suspicion, I would reject it. I reach that conclusion because a more strin-

gent standard is not suitable in the public school educational setting.

Attendance at public school is compulsory. *N.J.S.A.* 18A:38–25. The State is thereby assembling large numbers of young people in schools and has a duty to protect students from being harmed by others and by themselves. The students have a right to pursue their academic endeavors without exposure to dangers or overwhelming distractions. In other words, school authorities have a duty to maintain "a proper educational environment." 3 W. LaFave, *Search and Seizure* § 10.11, at 458 (1978).

School administrators must have broad supervisory and disciplinary powers, particularly because protecting students from dangers posed by anti-social activities is directly related to the educational process.[1] This goal has been supported by the Department of Education, which in its *Final Report, supra* note 1, at 59, states:

> In order to achieve the goals of instructional programs, local boards must actively assist students and staff by assuring a safe atmosphere, free from danger and disruption and one which promotes a positive environment conducive to learning. Disruptive behavior constrains the learning process and lowers school morale at all levels. A discipline policy must hold students accountable and consequently apply remedial and preventive steps that will ensure the safety and promote the education of all pupils.

In this respect the words of Judge Keating of the New York Court of Appeals in *People v. Overton,* 20 *N.Y.*2d 360, 362, 229 *N.E.*2d 596, 597–98, 283 *N.Y.S.*2d 22, 24–25 (1967), vacated, 393 *U.S.* 85, 89 *S.Ct.* 252, 21 *L.Ed.*2d 218 (1968), adhered to on

---

[1] The extent and nature of the problems in our schools are well documented. In July 1982, the Division of Research, Planning and Evaluation of the Department of Education published its *Final Report* required by *N.J.S.A.* 18A:4–29.1, repealed and supplemented by *N.J.S.A.* 18A:17–46. Between July 1, 1979 and June 30, 1981, school districts reported 21,721 incidents of violence, vandalism, drug abuse or any combination of these three. *Final Report on the Statewide Assessment of Incidents of Violence, Vandalism and Drug Abuse in the Public Schools* 2, 4, 5 (July 1982) [hereinafter cited as *Final Report*]. This staggering total may well understate the actual figures due to under-reporting. *Id.* at 2.

rehearing, 24 *N.Y.2d* 522, 249 *N.E.2d* 366, 301 *N.Y.S.2d* 479 (1969), bear repeating:

> The school authorities have an obligation to maintain discipline over the students. It is recognized that, when large numbers of teenagers are gathered together in such an environment, their inexperience and lack of mature judgment can often create hazards to each other. Parents, who surrender their children to this type of environment, in order that they may continue developing both intellectually and socially, have a right to expect certain safeguards.
>
> It is in the high school years particularly that parents are justifiably concerned that their children not become accustomed to antisocial behavior, such as the use of illegal drugs. The susceptibility to suggestion of students of high school age increases the danger. Thus, it is the affirmative obligation of the school authorities to investigate any charge that a student is using or possessing narcotics and to take appropriate steps, if the charge is substantiated.

In light of such policy considerations, the "reasonableness" of the searches in the cases before us must be measured against the nature and extent of the intrusions involved. I part company with the majority's opinion in its assessment of the reasonableness of the school officials' conduct in these cases under either a "reasonable grounds to believe" or a "reasonable suspicion" standard. Regardless of the standard employed these minimal invasions of a student's privacy were a valid exercise of a school administrator's authority.

After paying lip service to the principle that school officials have the authority to conduct reasonable searches necessary to maintain safety, order and discipline within the schools, *ante* at 343, the majority evaluates the conduct of the school official as if he were a policeman. If the school authorities acted properly, it is implicitly conceded that use of that evidence in a subsequent juvenile delinquency or criminal proceeding would be lawful. Our conclusion in these two cases centers on the propriety of the actions of the school administrators. No claim is made that the school officials were acting in concert with or on behalf of the police.

### T.L.O.

The issue in *T.L.O.* is whether the assistant principal acted reasonably in opening the student's purse. A teacher had re-

ported that she saw T.L.O., a 14-year-old girl, smoking in the girls' lavatory. Smoking at that location was forbidden by school regulations. When the assistant principal questioned T.L.O. as to whether she had "been smoking in the bathroom," T.L.O. replied that she did not smoke. The assistant principal asked for her purse and opened it. There—right on top—was a package of Marlboro cigarettes. The immediate question is, was the opening of the purse "reasonable" under these circumstances.

No one questions the validity of the school regulation. Smoking not only involves fire hazards, but also threatens the health and comfort of others. *See N.J.S.A.* 26:3D–18 (requiring public schools to display sign "indicating that smoking is prohibited in the building except in designated areas"); *N.J.S.A.* 26:3D–9 (prohibiting, with exceptions, smoking in all health care facilities); *N.J.S.A.* 26:3D–3 (prohibiting smoking "in every passenger elevator in every building other than a single family dwelling"). School officials undoubtedly had a right to enforce that regulation and, in doing so, to investigate infractions and identify the wrongdoer. T.L.O.'s response was not simply a denial of having smoked in the lavatory, but a claim that she did not smoke at all. Her credibility was at issue. Was the school teacher's visual observation correct? Was T.L.O.'s denial predicated on the claim that she did not smoke at all to be believed? By denying that she smoked at all, she made the truth of that assertion at least relevant, and perhaps dispositive, of the accuracy of the teacher's allegation. Was it reasonable simply to open the purse without searching or rummaging through it? There the cigarettes sat on top, plainly visible. The existence of the cigarettes under these circumstances was directly related to the assistant principal's investigation. Once the cigarettes were found he was assured that T.L.O. had not been truthful and had probably violated the school regulation. When balancing the intrusiveness of searches such as opening the purse to see the immediately visible contents, with the broad supervisory authority of the school administrator to enforce a policy prohibiting

smoking, a policy grounded in safety and health, the assistant principal was not only warranted, but also might well have been derelict had he not acted as he did.

Once the cigarettes were removed, the drug paraphernalia were in plain view, as the trial court found. Thereafter the assistant principal was justified in continuing his search to determine the extent of that violation.

### ENGERUD

Joseph Abate, vice-principal of Somerville High School, had heard, six months to a year before the incident giving rise to this case, that Jeffrey Engerud, a student at the high school, had been dealing in illegal drugs. Thereafter on one or two other occasions he heard rumors to the same effect. Michael Crisci, principal of the high school, had also heard that Engerud was involved with drugs. On January 29, 1980 the police advised Mr. Abate that they had received a phone call from the father of a student charging Engerud with selling drugs at the high school and threatening to take matters into his own hands if the police did not stop it.

Mr. Abate, Mr. Crisci and Mr. Carpenter, an assistant principal, discussed the matter. Mr. Crisci decided that it was "reasonable" under these circumstances to search Engerud's locker to see if anything might be there. That belief being well-founded, the search should be sustained. In upholding a search of a student's locker in *People v. Overton,* the court commented:

Indeed, it is doubtful if a school would be properly discharging its duty of supervision over the students, if it failed to retain control over the lockers. Not only have the school authorities a right to inspect but this right becomes a duty when suspicion arises that something of an illegal nature may be secreted there. [20 *N.Y.2d* at 363, 229 *N.E.2d* at 598, 283 *N.Y.S.2d* at 25]

Furthermore, Mr. Crisci had a passkey that could open any locker, a fact of which the students were aware. The student's expectation of privacy in the locker must assuredly have been diminished. A student had the right to exclude other students, but not school authorities who might reasonably be expected to

inspect the locker upon reasonable belief or suspicion that contraband was hidden there.[2]

Various rumors that came to the attention of the authorities at different times, coupled with the telephone call of an irate parent, certainly justified the school authorities in taking action.[3] No matter what standard is applied—reasonable grounds to believe or a reasonable suspicion that Engerud was dealing in goods—the opening by the school principal of the locker, to which he had a key, cannot be said to have been an undue intrusion of Engerud's right of privacy in the locker.

As a matter of policy I would encourage school administrators to investigate violations of rules and regulations designed for the welfare of the student body. A similar position was expressed by the Sixth Essex County Grand Jury, investigating drug abuse among school age children in Essex County, which concluded:

> We must face up to the fact that, because of its very nature, the school is the natural focal point for bad as well as good. Administrators must recognize that drugs are being used in their schools. Society must understand that the first

---

[2]The majority emphasizes a student's expectation of privacy in a locker by characterizing it as a "home away from home." *Ante* at 348. Needless to say, the record in this case does not support that assertion. It would be well for school authorities to dispel any such notion of privacy by notifying students that their lockers are subject to inspections by the school principal or vice-principal when he has a reasonable suspicion that a search is justifiable to insure compliance with school regulations. 3 W. LaFave, *Search and Seizure* § 10.11, at 463 & n. 54 (1978).

[3]The fact that the caller did not give his name does not negate a reasonable belief or suspicion in view of the several rumors that had come to the attention of the authorities. *Cf. Illinois v. Gates,* —— *U.S.* ——, ——, 103 *S.Ct.* 2317, 2328, 76 *L.Ed.*2d 527, 543–44 (1983) (information from an anonymous informant is to be viewed in totality of circumstances to determine existence of probable cause). The majority's reliance upon *Aquilar v. Texas,* 378 *U.S.* 108, 84 *S.Ct.* 1509, 12 *L.Ed.*2d 723 (1964), and other cases relating to probable cause is misplaced. The majority by its own terms would require "reasonable grounds to believe," not probable cause, in public school searches. Evidential prerequisites for a reasonable belief or suspicion in a non-criminal matter differ from those necessary to infer probable cause in police enforcement.

step in eradicating the problem is to recognize its existence. *School officials who recognize the problem of drug abuse and implement steps to cure the problem must be applauded. Their efforts must be met with understanding and sympathy by the community they are serving. [Presentment of Sixth Essex County Grand Jury for the 1978 Term 21 (1979) (emphasis added)]*

Today this Court has substituted its judgment as to what constitutes reasonableness for the judgments of those who are charged with the responsibility for school discipline and supervision, as well as for those of the two trial judges. I would prefer to support public school administrators rather than frustrate their efforts to overcome what has become an overwhelming problem.

I would uphold both searches and affirm the judgments.

Justice GARIBALDI joins in this opinion.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK and O'HERN—5.

*For affirmance*—Justices SCHREIBER and GARIBALDI—2.