746 A.2d 405

**In re PATRICK Y.**

**No. 27, Sept. Term, 1999.**

Court of Appeals of Maryland.

Feb. 18, 2000.

Bradford C. Peabody, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARELL, JJ.

WILNER, Judge.

The District Court of Maryland, sitting as the juvenile court in Montgomery County, found petitioner to be a delinquent child by reason of his having had a deadly weapon and a pager in his possession while on public school property. He admitted possession of the two items and complains only that they were unlawfully obtained by the State and, for that reason, should have been suppressed. The trial court rejected his contention that the seizure of the items violated his Fourth Amendment rights, and the Court of Special Appeals affirmed. *In Re Patrick Y.*, 124 Md.App. 604, 723 A.2d 523 (1999). We agree and shall affirm the judgment of the appellate court.

## BACKGROUND

Petitioner was an eighth grade student at the Mark Twain School in Montgomery County. The school is a public middle and senior high school that, at its Rockville campus, serves approximately 245 children with significant social, emotional, learning, and behavioral difficulties. The school publishes a set of "Policies Regarding Student Behavior," a copy of which was given to petitioner and his parent and was signed by them. The document states that the school is "committed to maintain a safe environment for students and staff," and advises:

"Mark Twain subscribes to Montgomery County Public Schools' Search and Seizure policy, which provides that the principal or the administration's designee may conduct a search of a student or of the student's locker if there is

probable cause to believe that the student has in his/her possession an item, the possession of which constitutes a criminal offense under the laws of the State of Maryland. These items include weapons, drugs or drug paraphernalia, alcohol, beepers and electronic signalling devices."

At approximately 10:40 on the morning of May 23, 1997, the school security officer, Patrick Rooney, received information from a source he could not recall that "there were drugs and or weapons in the middle school area of the school." Mr. Rooney alerted the principal, who authorized a search of all lockers in the middle school area. The record indicates that the search was conducted by Mr. Rooney and one other person but does not reveal how the search was conducted. We do not know how many lockers were searched, other than that the search did not extend beyond the middle school area, or how the search was conducted. No evidence was produced of whether the lockers were even locked or, if locked, whether the school had a master key or a list of the combinations that would open combination locks, although a fair inference can be drawn from the apparent ease with which the search was conducted that the school had ready access to the lockers. As petitioner was not informed in advance of the intent to search his locker and was not present when his locker was opened, it is clear that the locker was opened without his assistance or permission.

Inside petitioner's locker, Mr. Rooney found a bookbag, which he also searched. Inside the bookbag were the two contraband items—a folding knife with a 2½ inch blade and a pager—both of which, as noted, are expressly forbidden on school property. Petitioner, it appears, was in some other, unrelated difficulty at the time of the search. He had threatened to leave the school building without permission and was being restrained on that account when he was confronted with the knife and the pager, which he admitted were his. The issue raised by petitioner is whether the Fourth Amendment was violated "by a search of Petitioner's locker, based solely upon a vague and unsubstantiated rumor, 'that there were drugs and or weapons in the middle school area.' "

Petitioner asserts that (1) he had a legitimate expectation of privacy in his locker, (2) whatever may be the Constitutional standard for conducting locker searches, the published school policy required probable cause, which was lacking, (3) the school officials did not have even a "reasonable suspicion," that there was any contraband in his locker, and (4) by opening his bookbag, the search exceeded any permissible scope that might have justified opening the locker. Relying principally on *Vernonia School District v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), the State contends that general reasonableness, not probable cause, is the appropriate standard to apply and that, under that standard, the search of petitioner's locker and bookbag was justified. It urges that petitioner had, at best, only a limited privacy interest in his school locker, that the search of the locker was a minimal intrusion, that school safety constitutes a compelling governmental interest, that the locker search was an "efficacious" means of satisfying that interest, and that, on balance, the minimal intrusion of the locker search was outweighed by the compelling interest in school safety.

■ As noted, the issue raised in the petition for *certiorari* was limited to whether the search of petitioner's *locker* violated the Fourth Amendment. That statement of the issue does not include any complaint about the search of the bookbag or, indeed, whether petitioner was entitled to relief solely because the locker search violated the published Montgomery County School Policy. Because it was not raised in the petition, we shall not consider the search of the bookbag. The published school policy needs to be addressed, not as an independent basis for suppression, but in the Fourth Amendment context of its effect on petitioner's reasonable expectation of privacy in the locker.

## DISCUSSION

Two Supreme Court cases have come to dominate the current debate over locker searches in the public schools— *Acton, supra*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564, and *New Jersey v. T.L.O*, 469 U.S. 325, 105 S.Ct. 733, 83

L.Ed.2d 720 (1985)—although neither of them dealt with a locker search. *T.L.O.*, the earlier of the two cases, involved the search of a student's purse. A teacher found T.L.O. and another student smoking in a school lavatory, which constituted a violation of school rules, and took the students to the vice-principal's office. When T.L.O. not only denied smoking in the lavatory but of even being a smoker, the vice-principal opened her purse, found and removed a pack of cigarettes, noticed cigarette rolling papers, and, knowing the connection of such papers to the use of marijuana, searched the purse further. The extended search revealed a small amount of marijuana, certain paraphernalia, and other evidence implicating T.L.O. in drug dealing. The evidence was turned over to the police. After questioning, the student admitted that she had been selling marijuana at the school, and, based on that confession, she was charged with delinquency. The trial court denied her motion to suppress the evidence taken from her purse, a decision set aside by the New Jersey Supreme Court.

The U.S. Supreme Court initially granted *certiorari* to determine whether the exclusionary rule enunciated in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) should apply in juvenile court proceedings, but it ordered reargument to consider the broader question "of what limits, if any, the Fourth Amendment places on the activities of school authorities." *T.L.O., supra*, 469 U.S. at 332, 105 S.Ct. at 737, 83 L.Ed.2d at 728. The ultimate resolution in that case was that the search did not violate T.L.O.'s rights under that Amendment, but the Court warned that its disposition of the case on that basis was not to be taken as an implicit determination "that the exclusionary rule applies to the fruits of unlawful searches conducted by school authorities." *Id.*, 469 U.S. at 333 n. 3, 105 S.Ct. at 738, 83 L.Ed.2d at 729. The Court also made clear that its focus was on the right to search the person or personal items carried by the student, which was the circumstance before it, and that it was not addressing the question now before us of "whether a schoolchild has a legitimate expectation of privacy in lockers, desks, or other school property provided for the storage of school supplies."

*Id.,* 469 U.S. at 337 n. 5, 105 S.Ct. at 740, 83 L.Ed.2d at 732. In that regard, it noted the conflict between *Zamora v. Pomeroy,* 639 F.2d 662 (10th Cir.1981) and *People v. Overton,* 24 N.Y.2d 522, 301 N.Y.S.2d 479, 249 N.E.2d 366 (1969), holding that school administrators had the right to search or consent to the search of student lockers, and *State v. Engerud,* 94 N.J. 331, 463 A.2d 934 (1983), holding that students have an expectation of privacy in their lockers.

On the merits, the Court first determined, as a threshold matter, that the Fourth Amendment *does* apply to searches conducted by public school officials. Largely because of the compulsory school attendance laws, public school officials, unlike their counterparts in private school, do not stand *in loco parentis* in their dealings with students and therefore do not have the exemption from Fourth Amendment requirements enjoyed by the parents. They do not merely exercise authority delegated to them by the students' parents, but act in furtherance of mandated educational and disciplinary policies.

Proceeding from that premise, the Court then recognized that students were entitled to bring to school "a variety of legitimate, noncontraband items," that there was "no reason to conclude that they have necessarily waived all rights to privacy in such items merely by bringing them onto school grounds," and that, as a result, the search of a child's person or of a closed purse or bag carried on the person was "a severe violation of subjective expectations of privacy." *Id.,* 469 U.S. at 337–39, 105 S.Ct. at 732–33, 83 L.Ed.2d at 740–41. Against that right of privacy, however, the "substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds" had to be balanced. *Id.* at 339, 105 S.Ct. at 733, 83 L.Ed.2d at 740. In that regard, the Court took note that, in recent years, the maintenance of order in the schools, which had never been easy, had "often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems." *Id.* It acknowledged that, even in schools spared the most serious problems, "the preservation of order and a proper educational

environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult." *Id.* That imperative requires "a certain degree of flexibility in school disciplinary procedures." *Id.* at 340, 105 S.Ct. at 733, 83 L.Ed.2d at 742.

In striking the balance, the Court concluded that the warrant requirement of the Fourth Amendment was unsuited to the school environment and that the generally applicable probable cause standard was unnecessary. Rather, it held, "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.* at 341, 105 S.Ct. at 734, 83 L.Ed.2d at 742. That, in turn, required a two-part inquiry: whether the action was justified at its inception, and whether the search, as conducted, was reasonably related in scope to the circumstances that justified the interference in the first place. As to that, the Court concluded:

> "Under ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction."

*Id.* at 341–42, 105 S.Ct. at 734–35, 83 L.Ed.2d at 743.

The New Jersey Supreme Court had applied essentially the same principles in finding the search unlawful, and the disagreement between the two courts was in their application to the particular facts. The U.S. Supreme Court concluded that the school officials had a reasonable basis for believing that T.L.O. had been smoking in the lavatory and that her purse might contain evidence of that conduct, in the form of cigarettes. It was not unreasonable, therefore, for the vice-

principal to search the purse for cigarettes. His discovery of the rolling papers while looking for the cigarettes gave rise to a reasonable suspicion that the purse also might contain marijuana, thereby justifying the extended search. Because the search was reasonable in both inception and scope, the evidence was not subject to suppression.

*Acton,* which was decided 10 years after *T.L.O.,* involved a different kind of search—random urinalysis for students involved in inter-scholastic athletics. The Vernonia school district, legitimately concerned over an increasing incidence of drug abuse on the part of students, which had led to a significant escalation in discipline problems, especially among student athletes, adopted a policy of requiring all students intending to engage in inter-scholastic athletics, and the parents of those students, to sign a written consent to the random drug testing of the students through urinalysis. Special efforts were made to assure both reasonable privacy in obtaining the specimens and confidentiality and reliability of the test results. Acton and his parents refused to consent to the procedure and when, as a result, Acton was not permitted to play football for his school team, he and his parents sued for declaratory and injunctive relief, claiming that the policy violated his rights under the Fourth and Fourteenth Amendments.

The Court began by observing that the ultimate measure of the Constitutionality of a governmental search is reasonableness—balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. Although a search conducted by law enforcement persons normally requires a warrant, issuable only upon a demonstration of probable cause, neither a warrant nor the probable cause standard are required where special needs make them impracticable. In *T.L.O.,* the Court concluded that the warrant requirement and the probable cause standard were not required in the student search setting—that adherence to a probable cause standard would undercut the need of school officials for freedom to maintain order. The *Acton* Court held that, although the search in

*T.L.O.* was based on individualized suspicion of wrongdoing, that too was not an "irreducible requirement" of the Fourth Amendment. *Acton, supra,* 515 U.S. at 653, 115 S.Ct. at 2391, 132 L.Ed.2d at 574. Suspicionless searches to conduct drug testing had been upheld for railroad personnel involved in train accidents and Federal customs officials, and random automobile checkpoints had been approved to search for drunk drivers, illegal immigrants, and contraband.

Turning then to the first aspect of the question—the degree of intrusion on a legitimate expectation of privacy—the Court confirmed earlier holdings that students in a public school setting, while not shedding their Constitutional rights at the schoolhouse gate, nonetheless have a lesser expectation of privacy than do adults. Simply as unemancipated minors, they lack "some of the most fundamental rights of self-determination." *Id.* at 654, 115 S.Ct. at 2391, 132 L.Ed.2d at 575. Although public school officials do not stand entirely *in loco parentis* with respect to the students, they do exercise a "custodial and tutelary" authority that permits "a degree of supervision and control that could not be exercised over free adults" and that cannot be ignored in conducting a "reasonableness" inquiry. *Id.* at 655–65, 115 S.Ct. at 2392, 132 L.Ed.2d at 576. Reflecting on the target group at issue, the Court held that legitimate privacy interests were even less with regard to student athletes, who are required to dress and undress in locker rooms not noted for their privacy, and who, in other ways as well, have a reduced expectation of privacy. The degree of intrusion manifested by the drug testing program on that reduced expectation, the Court held, was not significant in light of the procedures used in its implementation.

Addressing then the "nature and immediacy of the governmental concern," the Court noted the "compelling" need to deter drug use by schoolchildren. Indeed, it recognized that the effects of a drug-infested school extend beyond those using the drugs and impact as well on the entire student body and faculty by disrupting the educational process. That general concern was heightened in the particular case both by the

special vulnerability of student athletes to harm when either on drugs themselves or in contact with other athletes on drugs and by the significant increase in disciplinary problems actually experienced in the Vernonia schools that was attributed to drug use. Rejecting Acton's suggestion that a less intrusive alternative was possible—testing only on suspicion of drug use—the Court observed that it had "repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment." *Id.* at 663, 115 S.Ct. at 2396, 132 L.Ed.2d at 581. The net holding was that "when the government acts as guardian and tutor the relevant question is whether the search is one that a reasonable guardian and tutor might undertake," and in *Acton,* the answer was in the affirmative. *Id.* at 665, 115 S.Ct. at 2396–97, 132 L.Ed.2d at 582.[1]

Petitioner regards *T.L.O.* as the more relevant case, requiring some individualized suspicion as a necessary predicate for a locker search. He seems to view *Acton* as limited to student athletes and their lesser expectation of privacy, noting the Court's reference to their "communal undress," the fact that inter-scholastic athletics was a voluntary endeavor, and the further fact that, in *Acton,* most of the parents approved the drug-testing policy. We do not regard *Acton* as being so limited.

### Expectation Of Privacy

■ Both *T.L.O.* and *Acton* instruct us as to the analytical process that should be followed. First, we must determine whether, and to what extent, petitioner had a legitimate

---

1. Because *Acton* arose from a declaratory judgment action, the question left open in *T.L.O.,* of whether the exclusionary rule would apply in a juvenile court proceeding even if the search was unreasonable, was not presented. None of the lower court decisions since *T.L.O.* have addressed that issue, even when the case *did* arise from a juvenile court proceeding. The State has not raised the issue in this case, but instead has assumed that the exclusionary rule would apply and defends on the ground that the search was not violative of the Fourth Amendment. We too shall assume, *arguendo,* that the *Mapp v. Ohio* exclusionary rule would apply.

expectation of privacy in his locker. Although that is ultimately a legal issue, it depends on the facts. In *In Interest of Isiah B.*, 176 Wis.2d 639, 500 N.W.2d 637 (1993), the school system adopted a written policy, communicated to the students, that school lockers were the property of the school, that the school retained exclusive control over them, and that periodic general inspections may be conducted by school authorities for any reason, at any time, without notice, and without a warrant. The school administration had pass keys to all of the lockers, and students were forbidden to put private locks on them. In light of that overall policy, the court concluded that students had no reasonable expectation of privacy in the lockers made available for their use. *See also Shoemaker v. State*, 971 S.W.2d 178 (Tex.App.1998) (school had written policy, discussed with the students, that lockers remained under the jurisdiction of the school and were subject to search at any time upon reasonable cause, and school officials had pass key that opened all lockers); and *cf. People v. Overton*, 20 N.Y.2d 360, 283 N.Y.S.2d 22, 229 N.E.2d 596 (1967); *S.A. v. State*, 654 N.E.2d 791, 795 (Ind.App.1995).

In the absence of such a clear policy, and especially when there is a contrary policy purporting to limit the ability of the school authorities to conduct a search, courts have concluded that students do have some legitimate privacy interest, even if a limited one. In *Com. v. Snyder*, 413 Mass. 521, 597 N.E.2d 1363 (1992), where the school published a written policy that students had the right not to have their lockers subjected to unreasonable search, the court concluded that a student had a reasonable expectation of privacy, notwithstanding that the school officials had the combinations to the locks. In *Com. v. Cass*, 551 Pa. 25, 709 A.2d 350, 353 (1998), where the written policy, communicated to the students, was that lockers were subject to search without warning when school officials "have a reasonable suspicion that the locker contains materials which pose a threat to the health, welfare and safety of students in the school" and school officials were able to open lockers by use of a master key and by having required access to any combinations on private locks used by the students, the court

found a "minimal" privacy expectation. In *State v. Joseph T.*, 175 W.Va: 598, 336 S.E.2d 728 (1985), the court found a right of students to security against unreasonable searches and seizures by public school officials. Although school officials had a master key that would open all lockers, the student handbook noted that the Fourth Amendment protected "all citizens" from unreasonable searches and seizures and declared that students "do have rights to privacy and may reasonably expect that their lockers will not be searched unless appropriate school officials consider a search absolutely necessary to maintain the integrity of the school environment and to protect other students." *Id.* at 737 n. 10. *See also State v. Michael G.*, 106 N.M. 644, 748 P.2d 17 (1987); *In Interest of Dumas*, 357 Pa.Super. 294, 515 A.2d 984 (1986); and *S.C. v. State*, 583 So.2d 188 (Miss.1991), finding a privacy interest in student lockers without discussion of published school policy or general access to lockers by school officials.

As noted, the only *factual* evidence in this record bearing on whether petitioner may have had a legitimate expectation of privacy was the school policy statement that he and his parent signed which, in sharp distinction to the kinds of statements evident in the above-cited cases, purports to limit the right of school officials to search lockers to situations in which the official has "probable cause" to believe that the student has in his/her possession an item that is contraband under the *criminal* law of the State. On its face, and without regard to the broader legal context, that document, published by the local school authorities, could serve as a basis for an expectation that lockers will not otherwise be searched. That local policy cannot be considered in a vacuum, however. There is a statute enacted by the General Assembly, supplemented by a by-law adopted by the State Board of Education, that defines and controls the authority of school officials to search public school lockers, and it is that State policy that determines whether, and to what extent, petitioner had any reasonable expectation of privacy in the locker assigned to him.

Maryland Code, § 7–308 of the Education Article states:

"(a) *Authority to search student.*—(1)  A principal, assistant principal, or school security guard of a public school may make a reasonable search of a student on the school premises or on a school-sponsored trip if he has a reasonable belief that the student has in his possession an item, the possession of which is a criminal offense under the laws of this State or a violation of any other State law or a rule or regulation of the county board.

(2) The search shall be made in the presence of a third party.

(b) *Authority to search school.*—(1)  A principal, assistant principal, or school security guard of a public school may make a search of the physical plant of the school and its appurtenances *including the lockers of students.*

(2) The right of the school official to search the locker shall be announced or published previously in the school.

(C) *Rules and regulations.*—The [State] Department [of Education] shall adopt rules and regulations relating to searches permitted under this section."

(Emphasis in text added).

The State Board of Education has adopted a by-law, which constitutes an agency regulation, consistent with the legislative direction.   The by-law, found in COMAR 13A.08.01.14E and F., mirrors the statute.

The plain words of the statute and by-law establish a State policy distinguishing between the search of students and the search of lockers.   In conformance with the requirements of *T.L.O.,* the search of a student requires a reasonable belief on the part of the school official that the student has contraband in his or her possession.   School lockers, on the other hand, are not regarded as the personal property of the student. They are classified as school property, part of the "plant of the school and its appurtenances," and, no doubt because of that, school officials are permitted to search the lockers as they could any other school property.   No probable cause is required; nor is any reasonable suspicion required.

This policy is deliberate and has a long history. At least as early as 1970, before there was a statute on the subject, the State Board of Education had in effect a by-law, having the force of law, dealing with searches on public school property by both police officers and by school officials. Police officers were permitted to conduct searches, including searches of lockers, only upon a warrant. By-law 740 provided, in relevant part, that police officers, "upon the authority of a search warrant," may search that part of the school premises described in the warrant, and that "investigative searches" would be permitted only upon the authority of a search warrant "or in any case where the search is essential to prevent imminent danger to the safety or welfare of the pupil or other persons or school property." Such a search, the by-law continued, "shall not include a pupil's assigned locker unless specified in the search warrant." A more liberal policy was applied to searches by school officials, who, unless the search was "in connection with a police investigation," were permitted, at any time, to "conduct such searches as are essential to the security, discipline and sound administration of the particular school." No probable cause, or even individualized reasonable suspicion, was required when the search was conducted by school officials for their own purposes.

The first statute dealing with school searches was enacted in 1973. See 1973 Md. Laws, ch. 759, enacting a new § 96A to former Article 77 of the Code. Like the current law, the statute drew a sharp distinction between searches of students and searches of lockers. Under § 96A(a), principals, assistant principals, and authorized public school security officers were permitted to conduct a reasonable search of a student on school premises if the official "has probable cause to believe that the student has in his possession an item, the possession of which constitutes a criminal offense under the laws of this State." Section 96A(b), however, permitted those officials, without any determination of probable cause or reasonable suspicion, to conduct a search of "the physical plant of the school and every appurtenance thereof including students' lockers." The only complement to that authority was the

direction that the right of the official to search the locker must be previously announced or published within the school. Subsection (c) required the State Department of Education to adopt regulations "relating to searches permitted under this section."

Except for style changes, § (b), treating student lockers as school property and permitting designated school officials to search them as they could search other school property, without satisfying any minimum standard, has remained intact since 1973. In 1982, § (a) was amended as a result of *In Re Dominic W.*, 48 Md.App. 236, 426 A.2d 432 (1981), in which the Court of Special Appeals concluded that the search of a student suspected of breaking into another student's locker and stealing money and a watch was invalid because there was no probable cause to justify the search. The court noted, apart from any Fourth Amendment concern, that the Legislature, by statute, required probable cause for such a search. In the next session, the General Assembly, at the urging of a county school board, amended § (a)—by then recodified as § 7–307(a) of the Education Article—to permit the search of a student upon a "reasonable belief" that the student is in possession of an item, the possession of which is a criminal offense.

The initial State Board of Education by-law, adopted prior to 1970, remained intact, and thus inconsistent with the 1982 amendment, until 1990, when it was amended to provide that the designated school official could make a reasonable search of a student on the school premises if the official had a reasonable belief that the student was in possession of an item, the possession of which was a criminal offense. *See* COMAR 13A.08.01.14E (Supp.10). The by-law dropped any reference to the search of school property or lockers. In 1997, the by-law was amended in two respects. First, it was broadened to permit the search of a student on either school property or on a school-sponsored trip, if the school official has a reasonable belief that the student is in possession of an item, the possession of which constitutes a violation of *any* State law or a rule or regulation of the local school board.

Second, and more significant for our purposes, a new section was added to track the statutory provision dealing with searches of school property, authorizing the designated school officials to search lockers as part of the physical plant and appurtenances.

Although educational matters affecting the counties are under the control of the county board of education (*see* § 4–101(a) of the Education Article), the authority of the county school boards is always subject to statutes enacted by the General Assembly and to the supervening authority of the State Board of Education. A county board cannot adopt and enforce a policy affecting the operation of the public schools or the rights, privileges, or obligations of public school students that is inconsistent with public general law or with by-laws of the State Board of Education, which have the force of law. *See Wilson v. Board of Education*, 234 Md. 561, 200 A.2d 67 (1964); *Bd. of Education of Prince George's County v. Waeldner*, 298 Md. 354, 470 A.2d 332 (1984). By both statute and State Board of Education by-law, school lockers are treated as school property and are subject to search by designated school officials in the same manner as other school property. It is not within the power of a local school board or superintendent, or any subordinate official, to establish and enforce a policy that provides otherwise.

The Montgomery County policy statement upon which petitioner relies is obviously inconsistent with the governing State law. It imposes probable cause to believe that the student is in possession of an item, the possession of which constitutes a criminal offense as the standard necessary to justify a search of both students and lockers, which, under State law, is not the test for either. Accordingly, that local policy is invalid and nugatory and cannot serve as a basis for a student to have a *reasonable* expectation of privacy in the locker provided by the school. To rule otherwise—to give effect to the county policy statement as creating an expectation of privacy sufficient to create a Fourth Amendment threshold for school officials to meet—would give that policy a

precedence over the statute and State Board of Education by-law, which it clearly cannot have.

In light of the supervening State policy, this case is more akin to the situation in *In Interest of Isiah B., supra*, 176 Wis.2d 639, 500 N.W.2d 637, in which the Wisconsin court found no reasonable expectation of privacy, than to those cases in which a valid published policy precluding "unreasonable" searches or requiring "reasonable suspicion" to conduct a search led to a finding of some minimal expectation of privacy. As petitioner could have no reasonable expectation of privacy in the school locker, the search of it by the school security officer, upon direction of the principal, did not violate any Fourth Amendment right of petitioner.

█ Because we conclude that, in light of § 7–308 and the State Board of Education by-law, petitioner had no reasonable expectation of privacy in the locker temporarily assigned to him, we need not consider, if he had such an expectation, what the nature of it would be and whether the governmental interest in conducting the search and the limited nature and extent of the intrusion manifested by the search would none-theless suffice to justify the search.[2]

JUDGMENT AFFIRMED, WITH COSTS.

---

**2.** Chief Judge Bell, in dissent, takes the position that the direction in § 7–308(b)(2) (and the conforming direction in the State and Montgomery County school board regulations) that the right of a school official to search lockers be announced or published in the school effectively allows each school in the State to develop its own policy regarding locker searches, based simply on what the principal chooses to announce or publish. We did not deal specifically with the county school board regulation because it was neither mentioned nor relied upon by either party, but, as it is generally consistent with the statute and the State Board by-law, it adds little to the issue. It too treats lockers as part of the "school premises" and imposes no requirement of probable cause or even reasonable ground in order for school officials to search the lockers. The policy statement published by the Mark Twain school is as inconsistent with the county school board regulation as it is with the State statute and State Board by-law.

Section 7–308, in our view, was intended to establish a uniform State-wide policy regarding searches of students and school property in the public schools. The direction in § 7–308(b)(2) that the policy, as it

BELL, Chief Judge, dissenting:

The majority holds that a knife and a pager, recovered as the result of a search of the petitioner's school locker,[1] were properly admitted into evidence during the petitioner's delinquency proceedings. When the search occurred, the petitioner was an eighth grade student at the Mark Twain School in Montgomery County and, as such, subject to that school's "Policies Regarding Student Behavior," a copy of which he and his parent had received and signed for. In addition to stating the school's commitment "to maintain[ing] a safe environment for students and staff," the policy this document announces on the search of school lockers is as follows:

"Mark Twain subscribes to Montgomery County Public Schools' Search and Seizure policy,[2] which provides that

---

relates to lockers, be announced or published in each school was for the obvious and salutary purpose of ensuring that students would be given actual notice of the policy, to eliminate any basis for an expectation of privacy on their part. We cannot imagine—and there is certainly nothing in either the statute itself or in its legislative history to support such a suggestion—that, in directing such announcement or publication, the General Assembly could possibly have intended to allow each school to depart from that policy simply by announcing, at its whim, a different policy. Such a construction of § 7–308(b)(2) would be wholly unreasonable; it would not only allow each school to have its own policy, but would allow each school periodically to change its policy, from year to year or day to day, just by announcing a different policy. The legal and practical consequences of such a construction would extend beyond mere confusion and uncertainty to utter chaos. The problem in this case is not with the State law or with the State Board or county board regulations but with the fact that the policy statement issued by the Mark Twain school was not in compliance with either the law or those regulations and, for that reason, is invalid and nugatory.

1. The knife and the pager were in a bookbag in the locker, which also was searched. No issue of the propriety of that search has been presented, however.

2. The Montgomery County Public Schools Regulation on Student Rights and Responsibilities, states in pertinent part:
    "III.  Guidelines
    "N.  Search and Seizure
       "1.  The principal, assistant principal, or security assistant may conduct a reasonable search of a student on the school premises or on a school-sponsored activity under the following conditions:

the principal or the administration's designee may conduct a search of a student or of the student's locker if there is probable cause to believe that the student has in his/her possession an item, the possession of which constitutes a criminal offense under the laws of the State of Maryland. These items include weapons, drugs or drug paraphernalia, alcohol, beepers and electronic signalling devices."

Not surprisingly, the petitioner relied heavily on this policy in arguing that the evidence against him should be suppressed.

---

"a) He/she has reason to suspect that the student is in possession of an item, the possession of which constitutes a criminal offense under the laws of Maryland or a violation of any other state law or a rule or regulation of the school board,

"b) He/she conducts the search in the presence of a third party who is of majority age.

\*     \*     \*     \*     \*     \*

"4. The principal, assistant principal, or security assistant, may conduct a search of school premises including lockers.

"5.   When a search of a student's locker is to be conducted, the principal, assistant principal, or security assistant should make a reasonable effort to obtain the consent of the affected student(s) prior to the search.

"6.   The principal will inform parents and students, in writing, at the beginning of each school year regarding the laws and policies governing search and seizure, including specifically the right to search lockers."

Regulation History:  New Regulation, August 19, 1994;  revised June 27, 1997;  revised July 20, 1998.

The Montgomery County Public Schools Regulation on Search and Seizure states:

"III.   Procedures

"A.   The principal of each school will inform parents and students about the laws, policies, and regulations regarding search and seizure through distribution of the MCPS student handbook at the beginning of the school year.

"B.   Authorized personnel conducting a search of a student's person, possessions, or locker will make a reasonable effort to obtain the consent of the student prior to the search.  A third party of majority age must be present at the time of a search of a student.

"C.   Authorized school personnel may search a student's person, if the authorized person has a reasonable belief that the student has possession of an item, the possession of which is a criminal offense under the laws of Maryland or a violation of any other state law or MCPS policy, regulation, or rule."

The majority reviews and analyzes the "Supreme Court cases that [have] come to dominate the current debate over locker searches in the public schools," 358 Md. at 54, 746 A.2d at 408, *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 2d 720 (1985) and *Vernonia School District v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) and recognizes the arguments upon which the parties relied. *See* 358 Md. at 54, 746 A.2d at 407. But to reach its decision in this case, it did not accept the State's argument [3] or even totally reject the petitioner's. In fact, in rejecting the petitioner's arguments and determining that the school policy is inapplicable and, indeed irrelevant, the majority advances, and finds dispositive, an argument that the State neither relied upon [4] nor presented to the trial court and on which neither the trial court nor the Court of Special Appeals rested its decision.[5]

---

Administrative History: Formerly Regulation No. 270–7 May 21, 1979 (directory information updated, October 1986); revised June 11, 1993; revised October 4, 1996.

**3.** The majority opinion correctly summarized the State's argument:

"Relying principally on *Vernonia School District v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), the State contends that general reasonableness, not probable cause, is the appropriate standard to apply and that, under that standard, the search of petitioner's locker and bookbag was justified. It urges that petitioner had, at best, only a limited privacy interest in his school locker, that the search of the locker was a minimal intrusion, that school safety constitutes a compelling governmental interest, that the locker search was an "efficacious" means of satisfying that interest, and that, on balance, the minimal intrusion of the locker search was outweighed by the compelling interest in school safety."
358 Md. 50, 54, 746 A.2d 405, 407 (2000).

**4.** In its brief in this Court, the State did cite the State statute and posit that an argument could be made based on it that the petitioner had no expectation of privacy. That was done as apart of another argument, that while it is "an open question," whether students possess any privacy interest in their lockers, based on Maryland law, a finding could be made that a lowered, or no legitimate privacy interest existed; it was not advanced as the dispositive argument that the majority finds it to be.

**5.** Maryland Rule 8–131(a) provides:

Acknowledging that, "[o]n its face, and without regard to the broader legal context, [the school policy], published by the local school authorities, could serve as a basis for an expectation that lockers will not otherwise be searched," 358 Md. 50, 62, 746 A.2d 405, 412 (2000), the majority concludes that Maryland Code (1978, 1999 Repl.Vol.) § 7–308 of the Education Article [6] trumps that policy; "it is th[e] State policy [embodied in this statute] that determines whether, and to what extent, petitioner had any reasonable expectation of privacy in the locker assigned to him." 358 Md. at 62, 746 A.2d at 412.

Section 7–308 provides:

"(a) *Authority to search student.*—(1) A principal, assistant principal, or school security guard of a public school may make a reasonable search of a student on the school premises or on a school-sponsored trip if he has a reasonable belief that the student has in his possession an item, the possession of which is a criminal offense under the laws of this State or a violation of any other State law or a rule or regulation of the county board.

"(2) The search shall be made in the presence of a third party.

"(b) *Authority to search school.*—(1) A principal, assistant principal, or school security guard of a public school may

---

"(a) Generally. The issues of jurisdiction of the trial court over the subject matter and, unless waived under Rule 2–322, over a person may be raised in and decided by the appellate court whether or not raised in and decided by the trial court. Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal." In truth, the petitioner has had no opportunity to respond to the majority's argument and neither party has briefed the issue. This is another reason that only the issue we took this case to decide, rather than the issue the majority has chosen, should be addressed.

**6.** Unless otherwise indicated, all references are to Maryland Code (1978, 1999 Repl.Vol.) of the Education Article.

make a search of the physical plant of the school and its appurtenances including the lockers of students.

"(2) The right of the school official to search the locker shall be announced or published previously in the school.

"(c) *Rules and regulations.*—The [State] Department [of Education] shall adopt rules and regulations relating to searches permitted under this section."

As required by statute, the State Board of Education has adopted a by-law, which mirrors the statute. *See,* COMAR 13A.08.01.14E and F.

To the majority,

"The plain words of the statute and by-law establish a State policy distinguishing between the searches of students and the search of lockers. In conformance with the requirements of *T.L.O.,* the search of a student requires a reasonable belief on the part of the school official that the student has contraband in his or her possession. School lockers, on the other hand, are not regarded as the personal property of the student. They are classified as school property, part of the 'plant of the school and its appurtenances,' and, no doubt because of that, school officials are permitted to search the lockers as they could any other school property. No probable cause is required; nor is any reasonable suspicion required."

358 Md. at 63, 746 A.2d at 412.[7] After tracing the history of the State statute and the accompanying by-law, it concludes:

"Although educational matters affecting the counties are under the control of the county board of education (*see* § 4–101(a) of the Education Article [8]), the authority of the

---

7. The majority is correct that there is a conflict between the State statute and the school policy as it relates to the search of the student's person. At issue here, however, is the search of the student's locker, as to which I demonstrate *infra,* no such conflict exists.

8. Section 4–101 addresses the function of the county boards. It provides:

county school boards is always subject to statutes enacted by the General Assembly and to the supervening authority of the State Board of Education. A county board cannot adopt and enforce a policy affecting the operation of the public schools or the rights, privileges, or obligations of public school students that is inconsistent with public general law or with by-laws of the State Board of Education, which have the force of law. *See Wilson v. Board of Education,* 234 Md. 561, 200 A.2d 67 (1964); *Bd. of Education of Prince George's County v. Waeldner,* 298 Md. 354, 470 A.2d 332 (1984). By both statute and State Board of Education by-law, school lockers are treated as school property and are subject to search by designated school officials in the same manner as other school property. It is not within the power of a local school board or superintendent, or any subordinate official, to establish and enforce a policy that provides otherwise."

*Id.* at 66, 746 A.2d at 414. Finally, asserting that the Montgomery County school search policy "is obviously inconsistent with the governing State law," the majority holds that it "is invalid and nugatory and cannot serve as a basis for a student to have a *reasonable* expectation of privacy in the locker provided by the school." *Id.* at 66, 746 A.2d at 414.

I dissent.

As hard as the majority tries, it has not persuasively explained why the issue that we took this case to decide—whether the search of petitioner's school locker violated the Fourth Amendment—has not been presented. To be sure, it can not be gainsaid that the petitioner had an expectation of privacy. Not only was there a school policy granting a level of privacy, but it was communicated in the student policies, and given to the petitioner and his parent, both of whom were

---

"(a) Educational matters that affect the counties shall be under the control of a county board of education in each county.

"(b) Each county board shall seek in every way to promote the interests of the schools under its jurisdiction."

required to sign it in acknowledgment of receipt. Thus, the critical issue is whether the petitioner could legitimately rely on the policy, and whether the policy could give rise to an expectation of privacy.

The test of a valid privacy expectation is whether a subjective expectation of privacy existed that society would recognize as reasonable. *See, O'Connor v. Ortega,* 480 U.S. 709, 715, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714 (1987). Generally, Fourth Amendment protections are based on the petitioner's legitimate expectation of privacy in light of the relevant circumstances. *See, Katz v. United States,* 389 U.S. 347, 359, 88 S.Ct. 507, 515, 19 L.Ed.2d 576, 586(1967). Whether, in a given circumstance, a petitioner's expectation of privacy is legitimate and reasonable is determined by "balancing the need to search against the invasion which the search entails." *T.L.O.,* 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720, 731 (1985); *see also, Camara v. Municipal Court,* 387 U.S. 523, 536–37, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930, 940 (1967). The totality of the circumstances, including the nature of the thing alleged to be the basis of the expectation, the actions of the petitioner and of the school, all inform that determination.

Cases on searches of a student's person teach that "reasonableness of the circumstances" is the correct standard. *T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 742, 83 L.Ed.2d at 734; *Acton,* 515 U.S. at 652, 115 S.Ct. at 2390, 132 L.Ed.2d at 574. In *T.L.O.,,* the Supreme Court held that,

> "Determining the reasonableness of any search involves a twofold inquiry: first, one must consider whether the action was justified at its inception ... second, one must determine whether the search as actually conducted was reasonably related in scope to the circumstances which justified interference in the first place."

*Id.* at 341–42, 105 S.Ct. at 742, 83 L.Ed.2d at 734–35. While the Supreme Court has declined to extend this analysis to school lockers, other courts have, reaching different results. The majority argues that many cases involving the search of school lockers have held that the limited use of lockers, as well

as their accessibility by administrators via keys or combinations, impart no real expectation of privacy. *See, e.g. Zamora v. Pomeroy,* 639 F.2d 662 (1981), *People v. Overton,* 24 N.Y.2d 522, 301 N.Y.S.2d 479, 249 N.E.2d 366 (1969). Other jurisdictions have held that students do have a legitimate expectation of privacy in their school lockers. *See, e.g. State v. Engerud,* 93 N.J. 308, 460 A.2d 701 (1983), *State v. Michael G.,* 106 N.M. 644, 748 P.2d 17, 19 (1987), *In Interest of Dumas,* 357 Pa.Super. 294, 296–99, 515 A.2d 984, 985–86 (1986), *State v. Joseph T.,* 175 W.Va. 598, 336 S.E.2d 728, 737 (1985).

While differing on whether an expectation of privacy was created, these courts agree that a published school policy may determine if there is an expectation of privacy as well as its the extent. *See, e.g. Zamora v. Pomeroy,* 639 F.2d at 665 (The court held there was no reasonable expectation of privacy where the published school policy "state[d] that lockers remain under the jurisdiction of the school, notwithstanding the fact that they were assigned to individual students; that the school reserved the right to inspect all lockers at any time . . ."); *State v. Joseph T.,* 336 S.E.2d at 737 (The court found grounds for a locker search based on a "reasonable suspicion" of violation of school rules, where the student handbook stated that "[s]tudents do have rights to privacy and may reasonably expect that their lockers will not be searched unless appropriate school officials consider a search absolutely necessary to maintain the integrity of the school environment and protect other students.").

The school policy is thus the standard against which to judge whether the petitioner's expectation of privacy was reasonable in light of the circumstances. *See, T.L.O.,* 469 U.S. at 338, 105 S.Ct. at 741, 83 L.Ed.2d at 732 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393, 402. *See also, Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633, 641 (1980)).[9]

---

**9.** The school policy requires probable cause for the search of a student's locker. I have found no case upholding the probable cause standard as necessary in a school environment, but then I have not come across a

The State statute exists, to be sure, but it is by no means as clear as the majority says it is, nor is the local school policy obviously inconsistent with that statute. It also is quite clear that there has been utterly no compliance with the statutory requirement of prior notification, a circumstance which, by itself, would seem to call for suppression of the search fruits and reversal of the delinquency judgment.

Whether the school policy conflicts with and, therefore, is invalid in light of the State statute is an issue involving statutory interpretation. The majority relies on a plain reading of the State statute to demonstrate the conflict with the local school policy. As I view it, giving the statute a plain reading demonstrates only that the language of the statute is at best ambiguous. Once the ambiguity is exposed, it is obvious to me that the reading the majority gives the State statute is simply wrong.

I concede that, by giving subsection (b)(1) a liberal interpretation, one could conclude, as the majority does, that it gives the officials mentioned an absolute or unconditional right to search the physical plant of a school, including its lockers. So reading the statute renders subsection (b)(2) irrelevant; if the majority is correct, there is no reason for a requirement of prior notice. Prior notice of what the law has already clearly proscribed hardly seems necessary. Moreover, as the majority opinion makes clear, failure to give the notice does not affect the validity of the search. *See* 358 Md. at 67–68 n. 2, 746 A.2d at 415 n. 2. It is well settled that a statute should not be interpreted so as to render any part of it meaningless, surplusage, superfluous, or nugatory. *Gordon Family Partnership v. Gar on Jer*, 348 Md. 129, 138, 702 A.2d 753, 757 (1997); *GEICO v. Insurance Comm'r*, 332 Md. 124, 132, 630 A.2d 713, 714 (1993).

---

case in which the school, by its policy statement, created that level of privacy. In any event, the information on which the school in this case acted did not approach reasonable suspicion; the non-individualized tip which sparked the search of petitioner's locker fell far below both the school policy and that found applicable by the courts that have addressed the issue.

On the other hand, when § 7–308 is read in its entirety, another plausible interpretation becomes evident. Subsection (1)(a) sets forth a clear standard that governs the search of a student on school premises or while on a school sponsored trip—reasonable belief—and the only condition placed on the official conducting the search is that the search be made in the presence of a third person. *See* subsection (a)(2). This is to contrasted with section (b), which is structured quite differently. While subsection (b)(1), permits certain school officials to search the physical plant, including lockers, subsection (b)(2) addresses only lockers, requiring the prior announcement or publication of "[t]he right of the school official to search the locker." Because § (b) does not contain an express standard, even though it treats lockers differently, perhaps necessarily so, from the other parts of the physical plant over which the school officials have complete control and to which they have not ceded any rights to the students, I believe that a fair reading of that section as a whole is that the school officials are given the right to search the lockers, but the extent of that right, the standard to govern the exercise of that right, is left to the determination of the individual schools, which determination is required to "be announced or published previously in the school." Thus, rather than being inconsistent, the State statute and the local policy are totally consistent.

The interpretation I give § 7–308(b) is consistent with and true to the rules of statutory construction. *See, Roberts v. Total Health Care, Inc.,* 349 Md. 499, 523, 709 A.2d 142, 154 (1998) ("When interpreting any statute, Court must look to the entire statutory scheme, and not any one provision in isolation, to effect the statute's general policies and purposes.") (*quoting County Commissioners v. Bell Atlantic,* 346 Md. 160, 178, 695 A.2d 171, 180 (1997)); *Hyle v. Motor Vehicle Admin.,* 348 Md. 143, 149, 702 A.2d 760, 763 (1997) ("In interpreting statute, Court of Appeals construes statute as a whole, interpreting each provision of statute in context of the entire statutory scheme.") (*quoting Blondell v. Baltimore Police,* 341 Md. 680, 691, 672 A.2d 639, 645 (1996)); *Condon v. State of Maryland–University of Maryland,* 332 Md. 481, 491, 632 A.2d 753, 758

(1993) ("All parts of statute are to be read together to determine intent, and reconciled and harmonized to the extent possible.") (*quoting Wheeler v. State,* 281 Md. 593, 596, 380 A.2d 1052); *Williams v. State,* 329 Md. 1, 15–16, 616 A.2d 1275, 1282 (1992) ("Court attempts to divine legislative intent from entire statutory scheme, as opposed to scrutinizing parts of statute in isolation.") (*quoting Forbes v. Harleysville Mutual,* 322 Md. 689, 697, 589 A.2d 944 (1991); *Jones v. State,* 311 Md. 398, 405, 535 A.2d 471 (1988)). Moreover, under this interpretation every part of the statute has meaning.

Furthermore, this interpretation makes good common sense. The schools in this State are not monolithic; they are different. School officials are the ones best able to assess and define their school's needs and set the basic rules and regulations pertaining to discipline and ensuring the safety of the school. The Legislature simply provided the flexibility as to locker searches to allow individual schools to determine the standard to be applied to the search of school lockers, based on the school environment and experience. This interpretation accounts for the promulgation by the school of a policy as to lockers and explains why the policy was not overridden by the State Board, as it could have done.[10] If the majority interpretation were correct, there would be no reason for individual schools to address locker searches through their own policies.

While § 7–308(b)(1) grants certain public school officials the right to search student lockers, it fails either to clearly

---

10. The county policies which correspond to the Mark Twain School search and seizure policy have been in effect since 1979 and 1994, respectively. It should be noted, under COMAR 13A.01.02.01B, that,

"B. Power to Stay Action of County Boards.

The State Superintendent of Schools shall have the authority, either at the request of the President of the State Board of Education, or on his or her own motion, to order a stay, not to exceed 60 days in duration, of any action taken by way of rule, regulation, resolution, bylaw, or other order; provided, however, that the stay be issued within 5 days of the date notice of the action is received by the State Board of Education from the local board, that the stay may be dissolved at any time by the State Board of Education."

delineate a State-wide standard to govern that right to search or clearly to prohibit schools from defining for themselves the extent of their right to search lockers. The conclusion reached by the majority, that Maryland school districts may not impose conditions on the right to search lockers or formulate different standards, flies in the face of the statute.

Section 7–308(b) clearly conditions a school official's right to search a student's locker on the student having been given prior notification. In the case *sub judice,* previous notice of an absolute right to search was never given; indeed, the notice that was given was that the exact opposite situation applied. Therefore, I would hold that this is a sufficient basis on which to hold that the school had no right to search, even if the State statute is controlling. Invoking the right *post hoc* not only is unfair under the circumstances, but it violates expressly what is unambiguously the language of the statute and thus the intent of the Legislature. The majority argues that, because the school's announced policy was invalid, compliance with the State statute is excused. That can not be correct. As my mother put it to me years ago, "two wrongs do not make a right."